Okay, the next case is Claudia Rocio Gomez versus the Attorney General of the United States. Miss de Blasio. Good morning. May it please the court. My name is Alessandra de Blasio. I'm with the New York-based law firm Sherman and Sterling, and we represent Claudia Gomez Zuluaga in this immigration matter. I would request five minutes for rebuttal time, if that's okay. That request will be granted. Thank you very much. At the outset, I should say that the immigration judge, Judge Dorothy Harbeck, found Miss Gomez Zuluaga credible. She found that her testimony was consistent, that it was plausible. And this seems to be the only place in the matter that is not disputed between the parties, and it's not a dispute with the immigration courts and our client. Where is your client currently? She is detained. She's still in this country, though? She is still in this country. Just yesterday, one of the associates went to visit her, and they had moved her again. So she was in a correctional facility for a while, as opposed to a detention facility. But I thought we granted her motion to... You did. You did, but they haven't. It's taken a while to remove her, so... You granted the motion to undo the stay. Yes. Okay. There are several topics or issues that I could discuss. I was wondering if the panel had certain areas... There are a lot of questions. There are a lot of questions I have in this case. Just in simple terms, a basic question. Is this an imputed political opinion case, or is this a membership in a particular social group case? And if whatever it is, tell us what you're claiming. Because I'm not quite sure what you're claiming. Then I apologize, because the briefing did not make it clear. I believe it is both. And as this court stated in McQuaggle, very often these two issues are intertwined. So to start with the imputed political opinion, that's what is one of the characteristics of the social group. They're united in that respect. So initially, we believe that the FARC picked her up because she was one of a group of women that they had identified as dating military officers. And the first incident when they had her corralled together with the women, they told them, we know what you're doing, and stop it. That's where, to me, in our minds... Is that a social group? It starts to be a social group. Okay. And that's where the imputed political opinion starts. It's the opinion that she is with our enemy, she must be of a mind with them, she must be against us. And then the second time they stop her, this time they detain her by herself specifically, they take her apart. And they refer back to the first incident and they say, we've been watching, we know you haven't listened to us, you haven't stopped, you are dating a military officer. In fact, it was a police officer that time. So the second time, they now have her with this group of people who continue to date, continue to insult us, was the word that she testified they used. And so that's where they're identifying her as part of a group and they are imputing an opinion to her which is against them. And this is why we believe the case was so close to chavarria. Is that a rational inference that... I believe it's a rational... Somebody who dates a military man subscribes to his political opinion. I believe it is in the context of this, the guerrilla war that's going on there, particularly the area where she lived. She had testified that she had heard lots of combat between the government, the military, and the FARC. So it was an area that was really at battle. And so the fact that she chose size... So really, if the issue here is whether a young woman in Colombia can achieve asylum in the United States by deciding whom she's going to date, you say yes, she can. I think yes, in part. And I think that the social group actually splits into two different... I think it's an interesting case because it splits two different ways. I think you have a fundamental argument, how Escobar and the court has said in many cases splits between the characteristic. And I do believe, you can make the argument that the past persecution would have been because she couldn't... She was, like the women discussed in 15, the Orion women who objected to how they were treated. It's something that she could have stopped doing, and in fact she did, but she should not have had to stop having the choice with whom she wanted to associate. Similar to women in Iran, they may object, but they do put on the full veil, the chador, whatever they call it. But they shouldn't have to. I'm most curious about your 28-J letter. Yes. And tell me how your case fits in and why we should consider following the Second Circuit's holding in the Delgado case. With Delgado, I thought it was very interesting, the idea of future imputed political opinion. Because here, part of this now becomes retribution. Again, it's similar to Lacuago, some of the other cases that your honors have decided. She goes back and now they can say, no matter what we thought about you before, we may or may not have been right. It may or may not have been reasonable. But now you have told us that you refuse to work for us. We have told you that you must work for us. We're watching you. You must come back. And you have totally ignored what we've said. And to send her back, they could at this point, we believe, say, okay, we understand very clearly now. We impute to you the political opinion that you refuse to be on our side. Did she actually testify that she was threatened with death? Yes, she did. Several times she said that they threatened her with death, with the family. They also went to her father during the third incident, the kidnapping, which we believe followed from the first and second. And they knew who she was because they needed to go to her father while they had her kidnapped. And they told him that he should not go to the police or they would kill her. So it came up in several contexts. It's almost as if, though, and I think there's – I've read the Second Circuit's opinion in Delgado. It's almost as if with Delgado you're changing your claim a little bit here. I think I'm adding to the claim. I do believe that this case has so many different aspects that it can – you can grant her – one can grant her asylum on many different bases. How can you substantiate that what you're raising now was properly raised before the IJ? We raised many issues before the IJ. One of the issues we raised before her was we had discussed imputed political opinion that – well, we – rather than looking at my notes, I should just speak to you. We discussed several different ways that this would work out. So we didn't cite Delgado, obviously, because it came out way after the fact. But we did discuss with her the fact of going back to Colombia. She would be seen as somebody who was against them. The judge's focus was on recruitment and that recruitment isn't a reason not to grant asylum. However, so that issue did come up. Well, that's two different – I was a little surprised when you said that in response to the question about fear of future persecution, you phrased it in terms of political belief. I thought her argument was, look, the IJ found that in the third incident where I was abducted for eight days and chained to a bed for eight days, I was conscripted and I got out of there only because I convinced them that I would be of more value to them later and because I promised to return. And they said, return or we'll get you and we're going to monitor you. And she was saying, I am being persecuted because I'm a member of a particular social group consisting of Colombian people who have escaped from conscription. And my cousin was conscripted and was murdered when he – because he tried to escape. And that – this case is no different from, you know – Lukwaga. Lukwaga. And it's – I intend to ask your friend how he distinguishes Lukwaga, but I don't understand the argument about political opinion. I didn't realize she – I mean, she hasn't dated military men for years and they appear to know what she's doing. She says, whenever I'm there, they monitor me, they call me up, they know exactly what I'm doing. Why should she be fearful of persecution for having dated a military man eight years ago? I mean, is that rational? I think it's rational. I think she does have to fear it. That's what brought her into their sights. As I said, she's a marked woman now. That's – it fits in with – it's a status or characteristic that can't be changed. They will not forget or forgive her for having done that. So that will be one of the reasons that they would bring her – that she's in their sights and they may very well, we believe, probably will kidnap her again or take her again. Shouldn't this case, if we accept her position, be remanded because, as I read the record, these incidents occurred in San Francisco where her father lives? Correct. Her mother lives in La Granja? Now in Medellin. Okay. She was in La Granja, now she's moved to Medellin. Under the regulation, if we were to go your way, would you agree that the appropriate relief is a remand for the IJ to consider whether your client can reasonably relocate to a region of Colombia apart from San Francisco? I don't agree because part of that, the government had the burden to show that there were other places she could go to, and there was extensive – Well, the IJ didn't get into that, though. Because the IJ ruled against you on the claim for asylum and withholding, as I read the record, the IJ then didn't have the occasion or wasn't required to consider the relocation question because you didn't prevail on the threshold questions. I think, first, the government had to make the prima facie case to put it in the court for the court to decide. Secondly, I believe the IJ did address this issue, and she actually cited our expert, Hilton, to say that the FARC is all over the country, that this is a countrywide problem, it's endemic. So she may not have specifically stated, and therefore, there was nowhere for Ms. Gomez-Zulawaga to go. She did, throughout, I believe, her opinion, state how this was a problem, that the FARC is all over. So we would say from that, it is a recognition that there would be no other place for Ms. Gomez-Zulawaga to go. And we had cited to her the four towns that she was in, all of the areas that the FARC had been involved in. Thank you. Thank you, Mr. Bloddy. We'll have you back on, Bob. Thank you. Mr. Cantor. Thank you, Your Honor. Ethan Cantor for the Attorney General. On Judge Hardiman's question as to whether, should the court go petitioner's way, would remand for the internal relocation issue be appropriate? I think the court has it exactly right. The burden was not on the government. The regulations provide that where there is no past persecution, the possibility of internal relocation is a burden that falls on the petitioner to show that there is no possibility, and it wouldn't be reasonable to relocate. And I think the facts here are particularly significant in that respect, in the sense that Ms. Gomez never encountered the FARC, personally, anywhere other than her home village. Which suggests that elsewhere she may not be subject to that threat. Of course, with regard to a remand, I think it's also worth noting at the outset, although Ms. de Blasio addressed initially the question of a particular social group, it's clear that in this case the board denied the applications without reaching that legal question. It did not address it. It did not reach it. It didn't discuss this court's adoption of the Acosta factors, particularity. It certainly didn't discuss the board's new decision in matter of CA, which relates to social visibility, whether the society itself regards this group that has been claimed here, formulated as the particular social group, regards it as a group. All these factors the board didn't get into. Its citation to the Liguago case was merely related to its point regarding no persecution on account of. So, assuming it were a social group, the question the board focused on, and one of the key bases of this denial was there's no showing that she was persecuted on account of these previous dating relationships. I would also agree. Well, doesn't that argument depend upon your ability to segregate the three incidents? In other words, the most severe instance when she's chained to the bed, you're saying, well, that has nothing to do with political opinion. That's just conscription. Doesn't that invite us or require us to ignore that the first two incidents were, it seems to me, perhaps on account of imputed political opinion, in the same way that the applicant in Chavarria was deemed to have an imputed political opinion? I don't think that the board's ruling here depends entirely on segregating and analyzing the incidents as separate incidents. Okay, well, let me just challenge you then to tell us why the first and or the second incident aren't imputed political opinion incidents based upon our holding and rationale in Chavarria. Well, Chavarria, the reliance there, in fact, the petitioner would say Chavarria is controlling here, is misplaced for the following reason. There, the court placed great emphasis on the fact that the board had mischaracterized and understated the evidence there with regard to what happened to Chavarria. For example, the one point that the court focused on was that he testified that he thought the individual circling his house in a car may have been the paramilitaries who had assaulted the anti-government activists a week before, whereas the record clearly showed, as this court pointed out, that no, he recognized them. That was a mischaracterization of the evidence, a key to that decision. By contrast here, there's no mischaracterization of the evidence by the board and the IJ. They very clearly analyzed the petitioner's own testimony and the testimony of her expert, and those words, her words, are very important, and the IJ and board justifiably relied on them when she indicated that, particularly with regard to the third incident, that nothing happened to her. Petitioner argued no, it was that nothing visible happened, and I would say no. What the record shows is that she indicated nothing, not nothing appeared to have happened to me, but nothing. On the third, when she's chained to the bed for eight days, you're saying nothing happened? Well, in terms of the severity of harm, which is, I mean, there's two issues here. The board denied on the basis that the mistreatment did not rise to the level of persecution. That has to be wrong. I mean, isn't it eight days chained to a bed? Our precedents say that confinement is persecution. Are you arguing? I thought you were going to argue that that persecution was not on account of one of the prohibited grounds. Are you saying that that wasn't persecution? The third episode, abduction, we're talking about. I mean, it's what the board decided, which is two bases. Not even the board decided that. The board decided that the incidents did not rise to the level of persecution, and its alternative holding was that the persecution was not on account of the claimed bases. As to the first, no, that decision is supported, substantially supported, in both this court's precedent and the record, because one of the more recent cases cited by Petitioner is the Touré case, in which there were four incidents of mistreatment against the Petitioner. They included severe beatings and detention, and were all clearly substantively related by the political activity in that case. The question of whether confinement, chained to a bed, confinement plus threats, rise to the level of persecution. The whole point made by the Chavarria case and the others in this court is that it's a continuum. The court and the board and IJ assess the severity of persecution. Petitioner argues, you know, her case is no different than Luquego. They only differ in severity, but that's the whole point. It's not that being chained to a bed and receiving threats under some circumstances may rise to the level of persecution. But in this case, where the record shows that she returned from the incident, stating that they indicated that they simply wanted her to stay with them, quote-unquote, work with them, return and join them after her studies, and that her father was happy because nothing had happened to her, quote-unquote. They hadn't done anything to me. I'm not diminishing. Couldn't that just be a euphemism for not being beaten or raped? I mean, abducted, eight days, chained to a bed. I'm just surprised. It could be, Your Honor. I thought you were going to fight this case on the ground, but it's not on the calendar. I am fighting the case on that ground. All right. And if you are, then why isn't Gomez Zulaga similarly situated to Chavarria? Chavarria, the fellow, he's a random guy on the street. He doesn't necessarily have a political opinion, but he comes to the aid and comfort of people who do have strong political opinions against the government of Guatemala, right? So why isn't this petitioner similarly situated? She may not have any particular opinions, but she's dating these guys who are clearly with the government. That invokes the ire of the FARC. What's the distinction between the two? Well, the distinction is that this court found that the record showed unequivocally that they surveilled him, threatened him, put a gun to his head and his chest, and robbed him for that reason. The difference here is the totality of the circumstances. And this is what the court is asking me. If analyzed in totality, do they not show on account of the previous dating relationships? The evolution of the events here is that by the time of the third event, petitioner testifies. I ask them, why are you keeping me here? I haven't dated anyone. And she quotes them as saying, no, that's not it. OK, that is very significant because in this court's recent precedent cited by petitioner, the Ture case at page 443 F3 at 320, this court states even more significant. The persecutor's statements clearly indicate the persecutions were politically and ethnically motivated. The persecutor's statements are significant, clearly. So her proof failed then at trial on the imputed political opinion. But then we get into the question of having been seized, abducted, chained to the bed and released, told that we're going to get you back after you get your degree in dental hygienist school. Then the question becomes, is this like LaGuardia where now she is defined as a member of a social group? Well, the question of whether she's indelibly marred, I think that third incident demonstrates that by that time, the persecutors themselves are not marking her for that reason. Wait a minute, wait a minute, wait a minute. I think you misunderstood the question. I think the question is based upon the fact that looking at the third incident, abduction from her home to a place chained to a bed for eight days, told that she was going to be monitored, threatened that if she didn't come back and serve them, the IJ found that the reason for that persecution was that they were taking her with them, conscription. Right. And that she escaped from conscription. I would disagree with that. And she says, if I go back, they track me all the time I was in there in Columbia. And if I go back, they're going to kill me. Because just what they did to my cousin when he tried to escape from conscription. The only reason I escaped before was I made him a promise and convinced him I would be of more value to them later. And then I managed to escape to the United States. How is this different from Lugwago or Lugwego or however you pronounce it? Well, it seems like the same social group. That is, people who have been conscripted and who have escaped and are threatened with death for escaping. Okay. Well, that's not the social group that petitioner is claiming here. The social group that she's claiming is women who have dated or had intimate relationships with military and police in FARC-controlled territory and whose relationships become known to the FARC. Well, I don't just assume. I think she says that her social group is defined differently. Her brief says, I'm quite sure, that the social group is defined differently when you're talking about political opinion and the first two episodes. Okay. But it's defined, the social group that is claimed with respect to the conscription that the IJ found to have occurred is people who have been conscripted and have managed to escape. Assuming that's the case, how is this different from Lugwago? Based on submission of the 28-J letter, petitioner has now shifted focus to a, if Your Honor would characterize it as social group on that basis or imputed political opinion based on resistance to forced recruitment, then I think clearly the petitioner is not on solid ground because the Supreme Court's Elia Zacharias decision, the seminal case on this question, is that forced recruitment, without more, does not demonstrate persecution on the basis of a political opinion. Aren't the circumstances in Colombia different than the circumstances in Elia Zacharias in that the FARC is not the government? They may control a big swath of the country, but they're not the government. Which is another basis upon which the court could not reverse the board because it's not a government actor. But the government has a very difficult time controlling them and protecting people from persecution. It does, although the record demonstrates that they are actively engaged in doing so in this court, so held in the Jeremio Martinez case. But with respect to resistance to forced recruitment, it's a very important question because there's no evidence in this case, and this is the key thing, as to whether she is being punished for her resistance to recruitment. Quite the contrary, she persuaded them, you know, don't take me now, I'm more valuable to you later. They were not punishing her, they released her for that reason. They did not punish her for that reason. She got released by telling a noble lie that she would help them, and then she made her way to the United States. Isn't it fair to also infer that the FARC will be even less happy with her behavior when they learn that she spent a few years in the United States? If forced recruitment is considered to be a basis for political asylum, that would be in direct contravention of the holding in Elias Zacharias, where the court stated that Elias Zacharias still has to establish that the record also compels the conclusion that he has a well-founded fear that the guerrillas will persecute him because of that political opinion. Read, I don't want to be in your ranks, rather than because of his refusal to fight with them. In this case, it is merely Gomez Zuluaga's preference unknown to the FARC. She doesn't want to fight with them. In Luguego, this court said it's to be expected that the child soldiers do not want to be abducted, do not want to fight with the LRA. And that's at page 329. Wait a minute, can I interrupt you? Yes. Can we just forget about political opinion for just a moment? I want to read you a couple of sentences from the brief of your friend across the way, page 45. When she gets to talk about future, her claim that her client has proved a fear, an objective and subjective fear of future persecution, she says, upon her escape from FARC, albeit through a promise rather than physically filing through chains that restrain her, she became a member of a narrower social group than the one proposed with respect to the past persecution she suffered. The group is defined by a shared experience and her membership can be attributed to her escapee status. Now, I interpret that to mean that for purposes of determining whether she showed that she has a subjective and objective fear of future persecution if she returns to her native country, it is on the basis of persecution of a particular social group that is defined from people who have been conscripted and have escaped from conscription. Now, I thought that in Luago, we said that that was a particular, somebody in that status who had shared that kind of experience was a member of a particular social group. And we said that entitlement or can be entitled to asylum. Now, I'm asking you, and I asked you a little while back, how you distinguished the aspect of Luago that based the conclusion, the holding on a particular social group. And you keep referring to political opinion. Can you help me? Yes. And I'm sorry I didn't answer your question directly before. In Luago, this court found that the record demonstrated that the abducted child soldiers who had escaped and were later found and countered the LRA, this rebel group, that they were persecuted, tortured, forced to clear minefields and put in pits. By contrast, the record in this case, including the general background evidence, does not demonstrate that anyone in circumstances similar to the petitioner who gained their release in a promise of I'll come back after I finish school was ever tortured, marked, abducted. She was threatened with being killed and her cousin who was conscripted and escaped was killed. Now, how can you say that's not in the record? The circumstances relating to her cousin are completely not fleshed out in the record. It's completely unclear what happened and what the circumstances were. Certainly, it wasn't as a result of dating military officers. How did her cousin escape? It sounds to me like you're making the argument that she can't be analogized to other escapees unless other escapees were killed when they got away from the chains by saying that they were going to go to dental hygienist school and come back and help them fix their teeth. Does it have to be that specific for someone to be analogized to one who's been murdered? No, it doesn't. But the record doesn't demonstrate that Colombian citizens in the petitioner's circumstances, however general you want to characterize the group of women who have been held for a period of time because they associated with, it doesn't contain any background information that when they're later encounter the fart that they're tortured or mistreated in any way. With regard to Your Honor's question about the threats, can't we reverse the board simply on the basis of these threats which relate to the future? In Chevarria, this court made a very specific legal holding with regard to threats. It said that not all threats equal persecution. Not those that while sinister and credible but are not either highly imminent or concrete or which fail to result in any physical violence or harm. I don't believe the threats in this case meet that test at all. I don't believe that two years after two years from this incident where petitioner testified that she received, I think, quote unquote, I think a few cell phone calls. Three a month. I think the total is three, Your Honor. And I don't believe that they lasted much beyond the time that she left Colombia. Okay, Mr. Cantor, why don't you wrap this up? The red line's been on. Okay. Thank you, Your Honor. I think that the court cannot address the social group question because the board did not do it. And this court held in Valdivia, Viezo, Galdamez that where that's the case, that question must be remanded to the board. Otherwise, Your Honor, I think the court should sustain the board on the basis of its findings that either her experiences did not rise to the level of persecution or she was not persecuted on account of either of the two bases put forward. Thank you, Your Honor. Thank you, Mr. Cantor. Ms. de Blasio. Thank you again. I just wanted to go back quickly to something that Judge Hardiman raised and something Judge Stapleton raised. I may have overdone it in my enthusiasm, but I do think there are so many things possibly at play here. So when I introduced the 28J letter, it was not to then say it was just imputed political opinion in the future and nothing else. I just thought, oh, aha, this is much more articulate. They explained my thoughts much more articulately, but it was an extension of the argument of why she couldn't return. But with respect to what Judge Hardiman said, I just would point to the record at what I've called A21 and A30. And that's where A21 is the administrative record 130 and A30 is the administrative record 139. And that's where the judge discusses how countrywide, nationwide, that this woman is a victim of general civil strife. So I think that's an implicit finding that she could not return to Colombia. Not explicit, but something that she stated, which I think the court can rely on. Also, with respect to remand, I would rely on Chavarria again, that this court did not remand in Chavarria. It was one of the few cases I found the court did not remand. But I think it's similar here because even though the Board of Immigration Appeals may not have addressed everything that the IJ did, and in fact summarily, I think, rejected the argument, under this court's holding in Gao, where the Board of Immigration Appeals does not make findings or rulings, the court can refer to what the immigration judge analyzed. And she certainly analyzed the particular social group argument as well as imputed political opinion. If you have nothing further? I had noted a couple of other things. Okay. We thank you for your argument. Thank you very much. Thank both counsel for their arguments, and we'll take the matter under advisement. Thank you. Thank you. We'll also take a five-minute recess and come back for the last few cases. Please rise.